UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

ALLISON MARIE DUNBAR GUILLORY
Administratrix of the Estate of
Patrick Guillory, and as Parent
and Next Friend of WINTER
LAPATRIA GUILLORY and ARIEL JU'NEA
KEON GUILLORY

VS. C.A. NO. 06-171-S

REASON GUKUTU and CHRISTIAN
PERSONNEL, INC. d/b/a CHRISTIAN
CONSTRUCTION, INC.

COPY

DEPOSITION OF **DONALD JEROME CHRISTIAN**, a Witness in the above-entitled cause, taken on behalf of the Plaintiff, before Jeanne M.S. Derham, RMR, Approved Reporter in and for the State of Rhode Island, at the offices of Decof & Decof, P.C., One Smith Hill, Providence, Rhode Island on February 5, 2007, at 2:00 p.m.

APPEARANCES:

Decof & Decof, P.C.
BY: VINCENT T. CANNON, ESQ.
Counsel for the Plaintiff

Clinton & Muzyka, P.C.
BY: ROBERT E. COLLINS, ESQ.
Counsel for the Defendant

REPORTING ASSOCIATES
SHORTHAND REPORTERS
10 DORRANCE STREET
PROVIDENCE, RI 02903

DONALD J. CHRISTIAN, first having been duly sworn, testified as follows:

EXAMINATION BY MR. CANNON:

Q. Could you tell us your full name, sir.
A. Donald Jerome Christian.
Q. Mr. Christian, my name is Vincent Cannon. I represent the Plaintiff in this case and I'm going to be asking you some questions about your company and about the accident in this case. Have you ever been at a deposition before?
A. No.
Q. I'm sure your attorney has told you that I'll be asking you some questions and my questions and your answers will be taken down by the stenographer.
A. Yes, he has.
Q. And you have to respond verbally in order for her to take down your responses; okay?
A. I understand.
Q. And if you need to take a break, just let me know and we'll go off the record; okay?
A. Okay.
Q. And this deposition is the same as though you were testifying in court, the same oath and

the same rules generally apply; okay?
A. Okay.
Q. All right, sir. Could you tell us your address, please.
A. Business or personal?
Q. Why don't you give me your personal address and then your business address.
A. Personal is 3875 Riviere Du Chien, R-I-V-I-E-R-E D-u C-H-I-E-N, Mobile, Alabama 36693.
Q. Your business address?
A. 858 Butler Drive, Mobile, Alabama 36693.
Q. And what is the name of your business?
A. CC, Incorporated, CC, Inc.
Q. Is that the same company as Christian Personnel, Inc.?
A. That was one of my former companies.
Q. And has that changed into CC, Inc.?
A. No. It's always been CC,I. I started CC,I versus Christian Personnel later and it was a local company. I don't know how it got involved with this but it's a local Mobile only company. It only hires clerical people, that's basically it. The industrial company is CC, Incorporated and has always been that

since the beginning.
Q. And where is CC, Incorporated or CC, Inc., where is that incorporated, which state?
A. Mobile, Alabama.
Q. And do you own that company?
A. Yes.
Q. Do you have any partners?
A. No.
Q. Do you own all of the shares of that company?
A. Yes.
Q. Was that company the employer of Patrick Guillory, the decedent in this case?
A. No. That's SENESCO's employee; correct? Can I ask him a question? That's SENESCO's employee; right? Yes.
Q. Did you place Mr. Guillory at SENESCO?
A. No.
Q. Did your company?
A. No.
Q. Did Christian Personnel place him at SENESCO?
A. No. Christian Personnel never -- has never done business outside of Mobile, Alabama so this is a CC, Incorporated job. It's not a CPI job. I'm not sure how that got into it.
Q. Let's go back for a moment. Could you tell

Q. And are you married?
A. Yes.
Q. Any children?
A. Yes.
Q. How many children do you have?
A. Two of mine and one step, one stepchild and two of mine.
Q. Do they live with you at your home address?
A. Yes, unfortunately.
Q. What is the business of CC, Incorporated, what does it do?
A. We're a skilled labor provider.
Q. And what exactly does that mean, skilled labor provider?
A. We provide shipyards with skilled labor on a lease basis. We lease employees.
Q. Now, is SENESCO or Southeastern New England Ship Company one of your clients?
A. Yes.
Q. How long have they been one of your clients?
A. Since the day -- since I've been in business, five years, I think.
Q. When was CC, Incorporated formed?
A. Formed, '02.
Q. 2002?

Q. What company was that?
A. Micro-Fab. M-I-C-R-O - F-A-B.
Q. Where did you work?
A. Mobile.
Q. So you worked as a ship fitter for about five or six years?
A. Pipe fitter.
Q. Pipe fitter and then you worked for MK Productions for about five years?
A. Four.
Q. Four years and since CC, Incorporated was formed, have you worked for that company?
A. Yes.
Q. Do you presently work for that company?
A. Yes.
Q. What is your position?
A. President.
Q. Have you always been the President?
A. Yes.
Q. Now, you told me that CC, Incorporated is a skilled labor provider to shipyards; correct?
A. Yes.
Q. Do you provide skilled labor to any other companies besides shipyards?
A. I have the ability to but currently I do not,

and my insurance covers me anywhere I want to go but currently I am strictly in the shipbuilding and oil rig business. I have the knowledge and the ability to but not currently.
Q. Has CC, Incorporated provided skilled labor to any other businesses besides shipyards?
A. Yes, I've done a few industrial jobs, built a few power plants, a few paper mills in the first couple of years of my business I did but not much, very few jobs.
Q. How many skilled laborers has CC, Incorporated provided to SENESCO?
A. Since I've been there all together or at one time?
Q. Let's start -- you said the company was formed in 2002.
A. Uh-hmm.
Q. At the time it was formed, during the first year of operations, did you provide ship workers to SENESCO?
A. Yes.
Q. Let's say that year of 2002, can you give me an estimate of how many workers?
A. Not an accurate one, no, but it was very few,

between CC, Incorporated and the shipyard that employs these laborers?
A. When the shipyard runs into a spike and has a spike workload, they call me for supplemental crafts. They tell me to screen and bring "X" amount of workers to them and they will decide if they will be hired or not and if they okay them, they say they're qualified, then they take them and they pay me an hourly rate and the employees are paid by me.
Q. Now, do you withhold taxes from their checks?
A. Yes.
Q. Do your employees file W-4 forms?
A. Yes. They're regular employees, yes, sir.
Q. Does CC, Incorporated provide any benefits to these employees --
A. No.
Q. -- such as health insurance?
A. No.
Q. Is health insurance available to the employees?
A. I have health insurance available to them not through my company but there is a plan that's offered and I'm not too familiar with it. It's an HMO plan. I'm really not too

familiar with it. My Vice-President kind of sets that up for the employees. It's available. It's not through CC, Inc. We help them get it but it's not a CC, Inc. plan.

Q. Now, do you provide Workers' Compensation coverage for these employees?

A. Yes.

Q. That's paid for by CC, Incorporated?

A. Right, through AIG.

Q. You provide temporary housing for these employees?

A. I advance it to them. They pay everything themselves. I don't pay for anything. I advance them their lodging, transportation and meals and then they pay it all back. I don't provide anything.

Q. You set them up in housing when they come up to Rhode Island, for example?

A. I found a hotel for them and I'll advance their first two weeks lodging to them and then after that they're on their own and then they have to pay me back for the two weeks I advanced them. The rooms are in their names, not in my name.

A. Yes, here in Rhode Island.
Q. That's done once they come up?
A. It's done before they're hired here on the site in Quonset Point, at the doctor there at Quonset Point recommended by the shipyard.
Q. Who pays for the physical?
A. I do.
Q. Is it done on the SENESCO grounds?
A. No. It's on Quonset Point, in that area.
Q. Not at the shipyard?
A. No.
Q. Who pays for the drug testing?
A. I do.
Q. Is that done on the shipyard grounds?
A. No, at the doctor's.
Q. Is that done at the same time as the doctor examination?
A. Yes.
Q. Does Christian provide any training of its labor force?
A. If requested by the customer, yes.
Q. How about with SENESCO, have you or do you provide any training to skilled laborers you provide to SENESCO?
A. No. They don't want it.

Q. Who do you deal with at SENESCO?
A. I deal with purchasing.
MR. COLLINS: At what time? It has changed.
MR. CANNON: Let's say at the present time.
A. Explain deal with. You mean who I deal with -- who am I paid by? Who do I get orders from?
Q. I'll try to be clearer. Let's do it step by step. Do the skilled labor employees at SENESCO provide records of their time to you directly or to someone else at SENESCO?
A. SENESCO provides --
MR. COLLINS: I assume you mean skilled workers of CC,I?
A. Skilled workers of CC,I, time is kept by SENESCO and then every Monday SENESCO sends me their time. It's sent by SENESCO to me.
Q. Then what happens?
A. And then I do the payroll from there. Then I send the paychecks out.
Q. Who do you send the payroll to?
A. When there is a coordinator, I send it to the coordinator. He hands them out at the hotel.

Sometimes there is no coordinator.
Q. Have you always had a coordinator at the SENESCO site or near the SENESCO site?
A. Yes. We went I believe times without it but not really long.
Q. That's been true since 2002?
A. Yes.
Q. So the checks would go directly to the coordinator and then the coordinator would hand them out?
A. Correct.
Q. Who does the -- who reports the time at SENESCO to CC,I? Is there one person involved in that?
A. Whoever does their time keeping, SENESCO's time keeping.
Q. Now, presently, is there one person at SENESCO who would call you and tell you they needed some laborers to come down?
A. It changes. Currently I know them so well it's supposed to come from purchasing and that's the way it should be, is through purchasing. It's supposed to be one person but they always change in management and it's just such a whirlwind there all the time.

deal, part of the charge.
Q. Was that based upon the expenses of providing that, the respirator and the mask?
A. Yes. Correct.
Q. Now, it indicates that a "five panel drug testing to all CC,I employees"; is that right?
A. Correct.
Q. That was done by CC,I; right?
A. Correct.
Q. Then CC,I would provide "workers with hand tools for their trade/skill"; is that right?
A. That's right.
Q. What type of hand tools would be provided?
A. Depends on the skill.
Q. Let's say Mr. Gukutu's skill, what type of hand tools would be provided for him?
A. I'm not sure if he's a welder or a fitter. I'm really not sure. Basic hand tools is per class so it is pliers, small hand tools that will fit in a bucket, no electric tools, nothing electric. I'm talking about screwdrivers, gloves, pliers.
Q. For a welder would it provide the torch itself?

A. No.
Q. Propane?
A. Nothing mechanical, nothing electric, only hand tools, screwdrivers and pliers for any trade but for a welder it might be pliers, for a fitter it's a crescent wrench. Only small hand tools, nothing electric, nothing air operated, nothing gas operated.
Q. Now, would these workers have their own hand tools?
A. Yes.
Q. Would you provide additional tools?
A. No. I just assured the shipyard that each man that came through the gate would have this bucket with these small hand tools in it. I made the employee pay for the tools. I just told the employee he wasn't allowed to go to the job unless he had these small tools.
Q. You made sure they had the small tools to work with?
A. Right.
Q. And then the last line reads, "Background information, work history on all CC,I employees prior to start date"?

Q. Did CC,I offer any training in a particular skill or craft such as welding or pipefitting or anything of that nature?
A. No.
Q. Just skilled safety training?
A. Yes, sir.

(Signed contract was received in evidence as Plaintiff's Exhibit No. 2 for identification.)

Q. Let me show you a second document, Exhibit Two. Mr. Christian, this is a document dated September 26, 2003 and it has a signature on the bottom by Jerome Christian. Is that your signature?
A. Correct.
Q. Next to that there's a Jim Semmens. Is Mr. Semmens still at SENESCO, do you know?
A. No, he's not there.
Q. Now, if you compare this to Exhibit One, it looks as though the documents are identical except for a handwritten notation about two thirds of the way down the page. Do you see that?
A. Yes.
Q. Is that your writing or is that SENESCO's?
A. SENESCO's.

Q. That was agreeable to you; correct?
A. Correct.
Q. You would just withhold the taxes; correct?
A. Correct.
Q. Under (c), CC,I retains the right to hire, fire, discipline and reassign employees.
A. Outside of the yard, yes. This retains the right to hire and fire. It doesn't have anything to do with inside the shipyard. This is if they destroy the hotel, if they beat up my coordinator, if they get put in jail. Yes, I do agree with that. I agree with that outside the shipyard where the only place I have control of them, yes.
Q. The language "outside the shipyard" doesn't appear in that paragraph.
A. No, but the customer knows I have no control inside the shipyard.
Q. If an employee say destroyed the motel room, hotel room, went into a drunken rage, for example, CC,I would have the power to fire them?
A. Yes.
Q. If they got into difficulty with the police, for example, CC,I could fire them; correct?

A. Correct. I could take them off my payroll, yes. I could fire them off my payroll. The shipyard might elect to take them in there on their own. There's nothing I can do about it. Yes, I can take them off my payroll at any time.
Q. They would be off your payroll?
A. Yes, sir.
Q. It also says you could reassign an employee; correct?
A. To a difference shipyard, different state; correct.
Q. If an employee was a temporary employee of SENESCO, could you reassign that employee to a different shipyard?
A. Sure. I can pull him out of SENESCO and bring him to another site, sure.
Q. Assuming the employee agreed, of course?
A. Of course.
Q. Let's say you wanted to -- in the case of Mr. Gukutu, if he was working at SENESCO, for example, and you needed to reassign someone with his qualifications to a shipyard let's say in Maine or down south in Alabama, you could do that?

A. I could but I don't. I don't ever pull people from one job. I tell every customer I will never pull employees away from your job to fill another order to make the same money. It doesn't make sense for me to pull him off one bill rate to go get the same bill rate a thousand miles away. I don't do it but, yes, I could do it if I wanted to but I do not do it.

Q. You don't do it but if you wanted to and situations changed, CC,I would have the power to do that, could do that?

A. Could possibly lose the contract while doing it but, yes, we could do it. We'd probably lose the job if we did it but, yes, we could do it.

Q. It may not make business sense but CC,I could do that; correct?

A. Correct.

Q. Could CC,I also discipline an employee or suspend an employee from working at SENESCO?

A. If requested from working at SENESCO? I can suspend him from working in this state for me. I can tell him to leave. If requested by the yard maybe, if the yard says we want

you to suspend this guy, because they're always wanting to put blame on me so maybe they want to make me look like the bad guy. That has come up before. The shipyard says we don't want to fire him but we want him suspended. Only if I'm requested by the shipyard, never on my own.

Q. That has happened before?

A. Yes, that has happened on occasion.

Q. So SENESCO would contact CC,I and ask CC,I to suspend one of the leased employees?

A. Right.

Q. And would CC,I do that on occasion, suspend a leased employee?

A. We'll do whatever the customer wants us to do.

Q. But as far as reassigning an employee, although it might not make any business sense, you could reassign an employee even without SENESCO's permission?

A. Sure.

Q. Now, has CC,I ever disciplined an employee who worked at SENESCO in the past?

A. The only discipline I use is no rehire. I never hire them again in their lifetime.

That's the only discipline I use.
Q. Are these workers that you place at SENESCO, are they there for a particular period or an open-ended period?
A. It's a temporary position. It's a spike.
Q. Do you tell the worker that it looks like you'll be at SENESCO for one month, three months, six months, something of that nature?
A. Sometimes.
Q. And when that period ends, on occasion do you remove the worker?
A. Sometimes, yes.
Q. Would that be a decision made by CC,I?
A. No. It's made by SENESCO.
Q. Now, if CC,I wanted to terminate an employee for some conduct outside the yard, they could do so without SENESCO's permission; correct?
A. Correct.
Q. Discipline an employee for some conduct outside the yard, they could do that, too, correct, without SENESCO's permission?
A. Correct.
Q. Just so I'm clear, on occasion SENESCO would sometimes contact CC,I and say we want this employee disciplined or suspended. We want

do you know?
A. I think it was Jack. It was -- june of 2005, is that this accident?
MR. CANNON: Yes.
A. I think Jack was here at that time.
MR. CANNON: I think that's all I have, sir. Thank you very much for coming up.
MR. COLLINS: I do have a couple.

EXAMINATION BY MR. COLLINS:

Q. I just want to clear up Exhibit Four.
A. Okay.
Q. This was the one that was sent to you and was never executed?
A. Correct.
Q. So Exhibit Four never became a contract between you and SENESCO?
MR. CANNON: Objection.
A. Yes.
Q. Until Exhibit Six was signed?
A. Correct.
Q. At the time of the accident in June of 2005, the applicable contract was Exhibit Two?
A. Correct.
MR. CANNON: Objection.

Q. On the job at SENESCO, SENESCO in particular, does CC,I have any control of the work?
A. No.
Q. Is there any orders that are given by CC,I or any of their employees as to how the work is to be done?
A. No.
Q. That is all done by who?
A. SENESCO.
Q. Or their foremen?
A. Their foreman or lead man.
MR. COLLINS: That's all I have.
(Whereupon, the deposition concluded at 4:28 p.m.)

# C C,I

**Christian Construction, Incorporated**
**5743 Three Notch Road**
**Office (251) 666-6655 Fax (251) 666-6694**
**Toll Free (800) 710-6655 Cell (251) 583-1981**

September 26, 2003

Mr. Jim Semmens
Purchasing
SENESCO

Jim:

As per our conversation, CC,I will provide all skilled trades to SENESCO for $29.15 dayshift, $30.50 night shift, compound rate with seven (7) day payment terms.

CC,I will also provide the following:

- Pulmonary function, respirators (3M half mask) and respirator fit testing to all welders
- Five (5) panel drug testing to all CC,I employees
- Workers with hand tools for their trade / skill
- Background information (work history) on all CC,I employees prior to start date

After 520 hours, SENESCO will have the option to hire CC,I employees direct with the provision that CC,I can replace each of these men with a new hire. The exception to this is the CC,I Coordinators / Managers.

Currently, CC,I is actively recruiting (newspaper ads, etc.), to find employees from the northeast that SENESCO can hire direct after the 520 hour period.

As of Wednesday, September 3, 2003, CC, I has 15 men ready to work.
As of Monday, September 8th, CC,I will have 20 men (10 welders, 10 fitters) ready to work at 7 AM.
Please advise with contact information.

CC,I can deliver 25 men for every seven (7) days notice, *if requested by Senesco.*

CC,I now has a Safety company that will answer any questions your company has regarding CC,I's employees. The contact information is as follows:

Office (251) 661-7650; fax (251) 666-0332
Carmen handles all Workers comp claims and info
Rob Cowden (251) 421-0435, cell phone, handles all safety inspections, questions, training, etc.

SENESCO has the right to terminate any employee with union involvement.

CC,I guarantees our employees for ten (10) hours. If SENESCO is not satisfied within that ten (10) hour period, they will not be charged.

[signature] Jerome Christian
President

[signature] Jim Semmens 9/29/03
~~Purchasing~~
*Vice President Procurement*

PLAINTIFF'S
EXHIBIT
2
2-5-07