IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

C.A. NO. 06-171-S

ALLISON MARIE DUNBAR GUILLORY, Administratrix of the Estate of Patrick Guillory, and as Parent and Next Friend of WINTER LAPATRIA GUILLORY and ARIEL JU'NEA KEON GUILLORY,

Vs.

REASON GUKUTU and CHRISTIAN PERSONNEL, INC. d/b/a CHRISTIAN CONSTRUCTION, INC.,

---

DEPOSITION of **EARL BARDEN**, taken on behalf of the Plaintiff, pursuant to the Federal Rules of Civil Procedure, before Kristen M. Bengtson, RPR, Notary Public in and for the State of Rhode Island, at the offices of: Decof & Decof, P.C., One Smith Hill, Providence, Rhode Island, on Monday, October 16, 2006, at 3:10 p.m.

APPEARANCES:

Decof & Decof, P.C.
BY: VINCENT T. CANNON, ESQUIRE
Counsel for the Plaintiff

COPY

Clinton & Muzyka, P.C.
BY: ROBERT E. COLLINS, ESQUIRE
Counsel for the Defendants

Little, Medeiros, Kinder, Bulman & Whitney, P.C.
BY: ANDREW S. ULLUCCI, ESQUIRE
Counsel for Earl Barden

REPORTING ASSOCIATES
Shorthand Reporters
10 Dorrance Street
Providence, RI 02903
(401) 351-1660

**EARL BARDEN,**

A witness called on behalf of the Plaintiff,
having been first duly sworn,
deposes and says as follows:

**DIRECT EXAMINATION:**

Q. (By Mr. Cannon) Could you tell us your name, sir.
A. Earl Barden, B-A-R-D-E-N.
Q. Mr. Barden, my name is Vincent Cannon, and I represent the Estate of Patrick Guillory who was the fellow that died in the accident at SENESCO about a year ago, year and-a-half ago. Have you ever been at a proceeding like this before?
A. No, I haven't.
Q. I'm going to be asking you some questions about what you know about the accident and probably something about your background, and my questions and your answers will be taken down by the stenographer.
A. Okay.
Q. If you don't understand my question, just let me know, and I'll rephrase it. Okay?
A. Sure.
Q. If you need to take a break, let me know, and we'll stop the deposition.

A. Okay.
Q. Could you tell us your address, sir.
A. Yes. It's 1954 Cranston Street, Cranston, Rhode Island.
Q. Are you married?
A. Yes, I am.
Q. Have you looked at any documents in preparation for your testimony here today?
A. Today? I didn't look at any documents today, no.
Q. Have you spoken to anyone about this accident with the exception of your attorney?
A. I believe the Workmens' Comp., and I guess the life insurance company from SENESCO or whatever it is there they have, or company people.
Q. Have you given any -- let me strike that. Now, where are you employed?
A. SENESCO Marine.
Q. How long have you been employed there?
A. Approximately five and-a-half years.
Q. What is your position or title?
A. I'm a welding supervisor.
Q. Generally what do you do as a welding supervisor?
A. I'm in control of all the welding on the projects that we have. I issue the jobs to the welders, check the jobs, just make sure everything's going

this accident?

A. Yes, I did.

Q. How did you know him before the accident?

A. During the close of the boats, when we're getting ready to deliver them, the ship fitters and the welders work really closely together to tie up all the loose ends. And he happened to be working in an area that I was working in on the stern which had some bad areas of deflection in the deck, and his job was to take the deflections out with using the heat method.

Q. Did you supervise that work?

A. No, I just checked it to make sure it was all right.

Q. Was Mr. Gukutu able to do that work satisfactorily?

A. Yes, he was. He was very good at his work.

Q. Prior to the accident in this case, did you have a good opinion about Mr. Gukutu?

A. For the most part, yes.

Q. So you did not supervise him, correct?

A. No, I did not.

Q. That's true up to the present time?

A. Yes, it is.

Q. Have you ever discussed this accident with him,

was just stating that I was in the room and that I went over it with him. To that knowledge, I couldn't tell you any more.

Q. Now, at the time of this accident, where were you working at SENESCO, what part of SENESCO?

A. Well, I was working on the outside erection, the 44 barge.

Q. Where were Mr. Guillory and Mr. Gukutu working?

A. They were inside the barge. I was inside the barge also, but I was in cargo bay one, and they were in cargo bay three.

Q. Approximately what is the distance between those two locations?

A. 85, 90 feet.

Q. Did you --

MR. COLLINS: What was that?

MR. CANNON: 85, 90 feet.

Q. Could you see the man lift that was involved in this accident from your location?

A. No, I could not.

Q. Before you became aware that an accident had happened, did you see or observe any of the work being done by Mr. Guillory?

A. No. I couldn't say, no.

Q. So you didn't see them do any work before this

was just stating that I was in the room and that I went over it with him. To that knowledge, I couldn't tell you any more.

Q. Now, at the time of this accident, where were you working at SENESCO, what part of SENESCO?

A. Well, I was working on the outside erection, the 44 barge.

Q. Where were Mr. Guillory and Mr. Gukutu working?

A. They were inside the barge. I was inside the barge also, but I was in cargo bay one, and they were in cargo bay three.

Q. Approximately what is the distance between those two locations?

A. 85, 90 feet.

Q. Did you --

MR. COLLINS: What was that?

MR. CANNON: 85, 90 feet.

Q. Could you see the man lift that was involved in this accident from your location?

A. No, I could not.

Q. Before you became aware that an accident had happened, did you see or observe any of the work being done by Mr. Guillory?

A. No. I couldn't say, no.

Q. So you didn't see them do any work before this

Q. Steel erection?
A. Building steel buildings.
Q. When did you come back to Rhode Island?
A. Went there in '89, came back in '97, '98, somewhere around there.
Q. What was your work after you came back?
A. I work at Stanley Bostitch.
Q. What did you do there?
A. I was a press man.
Q. Did you get laid off from there?
A. Yes, I did.
Q. That's when you went to SENESCO?
A. That's when I went to school.
Q. School, that's right, New England Tech. And then SENESCO?
A. Yeah, it's the Foreign Trade Agreement so they paid for my school. They call it NAFTA.
Q. Okay.
A. Job went south so they sent me to school.
Q. Are you familiar with Christian Construction or CCI?
A. I work with them, yes.
Q. You have workers under you that are employees?
A. Yes, I do.
Q. Do you treat them any different than SENESCO

employees?

A. Absolutely not.

Q. You have the power over them to control their work?

MR. CANNON: Objection.

Q. Well, do you have the authority to control the work they do and the assignments?

A. If they're welders or if they're working on safety, yes, I do.

Q. If they're a worker under you?

A. Yes.

Q. You treat them exactly the same as SENESCO?

A. Absolutely.

Q. Have you ever had any instructions from anyone at SENESCO to treat any Christian Construction or CCI employees differently?

A. No, to the contrary.

Q. What have you been told?

A. I've been told they'd better be treated the same as SENESCO employees, no different.

Q. Who told you that?

A. Upper management, Gary Schuler. At the time, he was the CEO. My yard superintendent, senior vice president.

Q. The yard superintendent was?