UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALLISON MARIE DUNBAR GUILLORY
Administratrix of the Estate of
Patrick Guillory, and as Parent
and Next Friend of WINTER
LAPATRIA GUILLORY and
ARIEL JU'NEA KEON GUILLORY

COPY

vs.

C.A. NO.: 06-171-S

REASON GUKUTU and
CHRISTIAN PERSONNEL, INC.
d/b/a CHRISTIAN CONSTRUCTION INC.

DEPOSITION OF **MICHAEL PATRICK SCANNELL**, taken on behalf of the Plaintiff, Tuesday, October 24, 2006 at 10:12 a.m. pursuant to the Federal Rules of Civil Procedure at the law firm of Decof & Decof, P.C., One Smith Hill, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

DECOF & DECOF, P.C.
BY: VINCENT T. CANNON, ESQ.
Counsel for the Plaintiff

CLINTON & MUZYKA, P.C.
BY: ROBERT E. COLLINS, ESQ.
Counsel for the Defendants

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

some work with U.S.C. when I worked at Lockheed. They had a training program there. So I'm, like, in the door. I'm working with them now. It's just more of a financial issue.
Q And what would your doctorate be in?
A Safety management. That's the one I'm looking at. They have three options, safety engineering, safety management, and safety philosophy.
Q Okay. Now, when did you become employed by SENESCO?
A I think it was about two and a half years ago, three years ago, October.
Q Okay. So would that be October of 2003?
A I guess that would be right. I'm sorry. I don't know the date.
Q Approximately?
A Yeah.
Q About three years ago?
A Yeah, about three years ago.
Q And what was your initial position at SENESCO?
A I was hired to run the special projects at SENESCO. My experience is in risk assessment and safety and lien manufacturing, better known as continuous improvement. So I was hired by Gary Schuler, the chief executive officer, to pretty much shake, rattle, and roll SENESCO management to start thinking

and operating like a real company.

Q Did you, were you involved in setting up a safety program at SENESCO?

A Shortly after that their manager of safety and health hurt his back, believe it or not, and had to go on light duty and then subsequently quit. He's now a teacher. Anyway, I was asked by Gary Schuler if I would take over the program. And I said if I could generate it and run it, I would. So I became the director of safety. And I had to do the whole program from scratch. At this time safety was, like, probably seventh on their list of priorities there. Injuries and accidents were high, so I had to generate a whole program, hazard assessments, fire programs, PPEs, fall protection, mechanical equipment. I had to get guys licenses from the State to operate cranes. They didn't have them. I had to get their storm water, hazard material programs, air permits, quality. They were just pretty much a small company. They had doubled, maybe tripled in size and never realized what their potentials or what their legal obligations were. So I had to get that whole program up and started.

Q Okay. Now, did you form a safety committee as part of your responsibilities?

A Yes, I did.
Q And what was the purpose of the safety committee, generally?
A I was a one-man show. Even though the supervisors are responsible for safety in their area, you can't be in a shipyard with two physical locations, the dry dock area and the main production, which then has two major hangars, as well as an outside erection area, a launching facility and a maintenance facility with one man. So I needed arms.
Q Okay.
A So I set up a safety committee that worked in various areas of each building and each section. So that, periodically throughout the morning and the afternoon whenever their work gave them a natural break, they would soup their area and make sure, "Hey, you are wearing goggles and a shield while you're grinding. You do have fall protection on when you're at the right height. There are the right people, two-man role when working in high voltages," that type of pro--- I can't be there. I can't be everywhere.
Q All right.
A And the supervisors had a problem. They were so trained into production. And they were guys, who were a good shipfitter, but who just got promoted up

to the line. Very common problem. They don't know how to open their eyes to safety. So I had to have the committee member work with their appropriate supervisor to help open up their eyes.

Q All right. Now, I understand, Mr. Scannell, that there are employees at SENESCO, who are employed by SENESCO and some who are employed by company called CCI?

A Correct.

Q Is that right?

A (Deponent nods head in the affirmative)

Q Now, during your tenure at SENESCO, on average, approximately how many employees, to your knowledge, were employed through or by CCI?

A I would say we had a minimum of fifty. And we could have been as high as maybe seventy-five.

Q Okay. Now, you told us about the safety committee. Did any employees of CCI serve on the safety committee?

A Not a hundred percent, but, yes. Meaning all that they could not do is write safety tickets. CCI did not want the liability of a safety committee member writing up another worker for doing something wrong, but observed that it would be worthwhile to have a person speaking and observing their area.

Q Okay. Now, --
A So they were, say, ninety percent they were in there. Eighty percent they were part of the committee.
Q And how large was the safety committee? I mean, how many people were on the safety committee, approximately?
A Six, seven, eight, nine, ten, eleven, twelve. Twelve to fifteen.
Q Twelve to fifteen. And would all of these people be supervisors?
A Oh, no. They're workers from the floor. You have a few white hats, supervisors. And then the rest are the workers. You don't want to have a super---
I have a supervisor accountability program as well.
THE REPORTER: Wait a minute, please.
Q You have to slow down a little bit for her.
A I'm sorry.
Q And just, if you could just focus on the question.
A Yes, sir.
Q Okay? I know, I know --
A My brain works that way. I'm sorry.
Q That's okay. Everyone does it. But with regard to the, just the safety committee, how many people served on the safety committee.
A I stated twelve to fifteen.

Q Twelve to fifteen. Okay. And of the twelve to fifteen, how many were CCI employees?
A Two.
Q Two. All right. And what were their names?
A Manny, and I'm trying to think what his last name is. And told you the gentleman's name a few minutes ago, and I just forgot it, called Kerney Duckworth.
Q Kerney Duckworth. Okay.
A I'm sorry. I got the other gentleman's name. Benny Ortiz, not Manny.
Q And both those gentlemen, to your knowledge, were employees of CCI?
A Yes, they were.
Q And would they participate in the safety meetings?
A Oh, yes.
Q And would you discuss different safety policies and procedures during the meeting?
A Yes. Yes, sir, I did.
Q Now, did you also as part of your responsibilities set up a training program for workers to operate manlifts at SENESCO?
A Yes.
Q Okay. And did that program involve classroom instruction and on-the-job instruction?
A It did initially.

Q Okay. And in terms of the classroom instruction, would that be about two hours of classroom instruction?
A I actually combined fall protection and manlift together because of the criticality of both functions. So that was probably more like two and a half hours long, maybe even up to three.
Q Okay.
A Depending on the student's ability to take the exam and understand the questions.
Q And then there, would there be some on-the-job training component, too?
A Initially, yes, there would be.
Q Okay.
A That would consist of a practical, how to put on harness, how to attach and reattach, how to get into a manlift. Do you want to know what's in the practical for the manlift?
Q No. That's fine. That's fine. I'll just ask some specific questions. It will be easier. Now, do you know an individual named Reason --
A Gukutu.
Q -- Gukutu?
A Yes, sir, I do.
Q Now, did he go through the manlift training room?

A Yes, he went through the initial program, correct.
Q Okay. And did he successfully complete the program?
A Yes, he did.
Q Now, and as part of that program would he receive instruction in the operation of a manlift in this instance.
A Oh, most definitely, yes.
Q And would he be told as part of his instruction that when he was operating a manlift at SENESCO, he should be in exclusive control of the operation of the manlift?
A Yes, that's right.
MR. COLLINS: Objection.
THE DEPONENT: Yes, sir.
Q In other words, --
MR. COLLINS: You can answer. Sorry. I can't tell you not to answer. I'm just objecting.
MR. CANNON: He's objecting.
A Oh, you're objecting. I'm sorry.
Q He's objecting for the record. You can still answer.
A All right.
Q Now, so that, when an operator such as Mr. Gukutu was operating a manlift, such as the manlift involved in this case, that operator should be the only one controlling the manlift, correct?

Q Okay.
A Okay? You're out of control. You can't see. You can't respond.
Q Did the lift otherwise appear to be in good mechanical order?
A Yes, it did.
Q Now, following the, did you -- in your report, Mr. Scannell, you indicate that you had some confirmation that two workers were using the controls in the manlift, Mr. Guillory and Mr. Gukutu?
A M-hm. (Deponent nods head in the affirmative)
Q How did you receive confirmation of that?
A Oh, actually, Reason told us.
Q Okay.
A The workers in the area had observed it.
Q All right.
A That's, I think, where it came from.
Q All right. Now, you said Reason told you. You took a statement from him a couple of days later, you said?
A Yes, I did.
Q And what did he tell you at that point?
A From his assessment, the reason why Patrick was grabbing the controls was that Patrick was so much bigger than him that he was taking up too much of the

lift. And so Patrick kept helping out, kept putting his foot on the controls, kept operating the joystick. He didn't want to, he didn't like being pushed aside, allowing Reason to operate the lift.
Q Okay. Could --
A And that -- oh.
Q Could Reason have operated this lift without any assistance from Patrick?
A I've had guys twice my size in there. Yes, you can.
Q So this was --
A Does this mean I have to push close to another human being? Yes. But then --
Q So even though you have a large fellow employee or co-worker --
A Yes.
Q -- in that lift, the operator can still operate all of the controls?
A Yes, he can.
Q Okay.
A And they always have the option of asking maintenance to move the pedal to the center position. It's a twenty-five, thirty-minute job.
Q Okay.
A But if it's a rental piece of equipment, I don't know if this one was. Yes. Now, yes, I do remember it.

It was rental. We would have had to have gone through the rental company for that. So disregard my last statement, please. I'm sorry.
Q All right. All right. We'll --
A No. I'm sorry. My brain thinks sometimes too quickly. It could have been done. It wouldn't have been a fifteen- or twenty-minute task.
Q Now, in your report, Mr. Scannell, and I'll just show you. Let's see. Point it out to you. This is the third page, this paragraph here. We have confirmation. Do you see that? And you --
A Okay.
Q You write at the end of that particular section, you know: One was using a safety foot pedal and the lift movement, Guillory, and the other the basket rotation, tilt and height adjustment, --
A M-hm. (Affirmative)
Q -- Gukutu. And then you write: This is not an authorized manner to use the manlift. This action was unsafe as one operator must be in control of the manlift at all times. Is that right?
A That is correct.
Q And was that your conclusion?
A Oh, most definitely.
Q And, generally speaking, just I know we may have been

Mr. Gukutu?
A Yes.
Q And was he there when you first arrived?
A I don't know his date that he started working there.
Q Okay.
A But he was there for quite a long time. I've known Reason very well.
Q Now, was he a qualified worker?
MR. CANNON: Objection.
A (No response)
Q Was he a good shipfitter?
A I would not know that.
Q Okay. Did you have any -- well, let me take a step back about your last point about expected to know more. To your knowledge, were there any requirements that SENESCO initiated on CCI as to training for workers that came from CCI to work there?
A The upper management at SENESCO believed that, since they had more qualifications, that they would require less training by me. And they limited my time that I could train them.
Q Okay. And do you know if there was any requirements as by upper management as to training that was required to be done by CCI?
A No. CCI did not do any training. They were supposed

to have come to us trained.
Q They being the workers?
A Correct. Many workers came to us with experience. They said they had been working in shipyards for four to five years. And they couldn't do the job, and they were done within two to three. We let them go because they could not do the job.
Q Okay. So you, SENESCO had the power to let the people go?
A Oh, yes.
Q And they had the power to fire them?
A I don't know did they fire them, or did they just call CCI and say, "I don't want Mr. Schmo or Joe Schmo." I don't know that process. I'm not involved in it.
Q Now, Mr. Gukutu, to your knowledge, had there been any citations on him prior to this incident?
A I'd have to pull the safety file. I, I don't know. I'd have to see. Did they copy his employment record? I'd have a copy of any safety tickets in that file.
Q Let me show you what was provided by SENESCO as his, as Mr. Gukutu's employment file.
A This is what they gave you?
Q Yes.

MR. CANNON: Or maybe you should just count the pages for the record.

THE DEPONENT: One, two, three, four, five, six, seven, eight pages total.

Q Okay. Now, let me just, one thing on Exhibit C, does that refresh your recollection that the citation was actually seven thousand?

A I know. I'm looking, and I'm looking for Item 2.

Q Okay.

A Then I thought there was a three thousand dollar and a seven thousand dollar fine. I, obviously, if you're telling me it's a seven, then it's seven thousand dollar fine reduced to five.

Q Now, --

A You can see the problem you and I just had in the last two minutes putting all this paper together. And I have three years worth of accident reports of all different styles.

Q Now, let me ask you this. Was there any discussion as to why SENESCO was assessed the OSHA fine, rather than CCI?

A SENESCO's supervision. Person responsible for safety in any, any area anywhere is the supervisor, whether or not it's OSHA 1910, OSHA 1915, shipyards, OSHA 1917, maritime, OSHA 1926, construction. Doesn't

matter. Supervisor is the one who's responsible for his safety of his employees, period.
Q Okay. So SENESCO was the supervisor?
A Yes, he was.
Q And does that mean that SENESCO had the control of the worker?
MR. CANNON: Objection.
A Yes, it does. Oh.
MR. CANNON: Objection.
Q Do you know if there was --
A Well, the term control of the worker. Direction of the worker.
Q Direction of the worker.
A We're all human beings.
Q Right.
A And we all know that --
Q Yes.
A -- control of ourself is our own actions.
Q Obviously, it's only on-the-job. You don't control Reason Gukutu when's he's off the job?
A Or even when he works. I can tell you to do something right now, sir. And you can do it or not do it. It's your choice.
Q Do you know if there was any discussion with CCI as to whether or not they should contribute to the

settlement or any, or whether or not they should be the ones who are paying it?

A No, I did not discuss that. I didn't even go down that avenue.

Q Oh, one more thing. Was the manlift inspected after the incident?

A Yes. We had a, an independent company, Diverse Inspections, maybe. I know they're in here.

(Document handed to deponent)

A There you go. Diversified Inspections.

MR. COLLINS: Okay. Can we mark that? Oh, wait a second.

THE DEPONENT: I was letting her type the title.

MR. COLLINS: Yes.

A (Continued) We chose a independent company not related to us, not related to the rental company, not related to CCI or anyone to come in and tell us is the equipment up to speed or not.

(PHOTOSTATIC COPY OF FIVE-PAGE MANLIFT SAFETY INSPECTION REPORT OF DIVERSIFIED INSPECTIONS/ITL WAS MARKED DEFENDANTS' EXHIBIT D, IDENTIFICATION)

A (Continued) Are you going to ask me questions on this report?

(Brief recess)

MR. COLLINS: Okay. Now, couple of more questions.

Q Mr. Guillory, --

A Yes.

Q -- Patrick, was he a CCI employee?

A I believe he came up from the group in New Orleans but was hired by SENESCO.

Q He was a SENESCO employee?

A We don't have, we didn't have programs for contractors.

Q Okay. Now, one other thing, if you could, could you draw a bird's-eye view of the yard? You've referred to maintenance shed. You've referred to various things. And maybe you can just give us a rough idea of how the yard looks and where the barge was.

A I'm going to draw it first, and then I will explain it.

(Deponent drawing on yellow lined paper)

A Okay. Basically, what you have -- I don't know how you're going to type a photo. But --

Q It will just be marked.

A You have a main road that comes across, and you have two large hangars.

Q What's the name of the road?

A MacNaught.
Q Write that in.
A (Deponent complies) Well, I didn't actually do the streets correctly. I was just giving you a ballpark.
Q Yes.
A Okay? It's actually got MacNaught, and it runs into, not Howard Johnson -- I don't know. There's two roads that run through. I'm sorry. MacNaught's just one of the two.
Q It's not that important.
A All right? We have two hangars known as Building 1 and Building 2.
Q Okay. You wrote BLD 1 and BLD 2 --
A Okay?
Q -- on the side. Where is this -- where is the main entrance?
A Right here is the main gate. And here is the front office.
Q And between them?
A Yes, it is. There's also a second area gate over here on the side.
(Discussion off the record)
Q And you also made reference to the front office. Could you just put FO inside that?
A Certainly. There's also a secondary gate.

Q Okay.
A To the right of Building 1. It's referred to as the painters' gate.
Q Okay.
A Only one that uses it is the painting crew. They have to bring their large equipment in to paint the barge when we're done. We have three trailers, and they'll host the supervisors, the leadmen, and contractors.
Q Okay. In those three you put S, L, and C?
A S for supervisors, L for leadmen, C for contractors.
Q Okay.
A Over here to the left would be the barge. This would be the water. This would be our launching facility. The barge would be sitting on a railroad track.
Q The barge is on a marine railway?
A Nope. Just railroad tracks.
Q Oh, okay. Well, how do you get it into the water?
A We then extend the railroad tracks to the edge of the water. We bring a dry dock from our dry dock facility by tug around, locator on the side, extend the railroad tracks into the dry dock. And by using a steam powered generator or wench, pulling it backwards, you pull it right on the railroad tracks into the dry dock. Then you will float the dry dock

compensating for the weight. And once it enters the dry dock, we cut the ta--- we cut the railroad tiles, and the barge then sits inside the dry dock, and it naturally floats. At that point we drive her all the way around by two to three tugs and repark it again in our repair facility marked on the drawing by RF.

Q All right.

A RP. I'm sorry. We call it the repair yard.

Q Okay. And how big is the repair yard?

A It's an old aircraft carrier pier. It used to host two aircraft carriers. So it's a length -- it's a pier running down the center with imaginary, imagined or the size of a carrier to the right and a carrier to the left.

Q Okay. Good. Could you on this -- we'll mark this. Could you just sign and date it. This, it gives us a good layout of the yard.

A What is today? 10 what?

Q 24.

A (Deponent then complies)

Q And then also on Exhibit E, where you indicated that, could you just sign and date it somewhere below?

A I'm going to do it right, so you can see it.

MR. COLLINS: Okay. Let's mark this drawing as an exhibit.

(DIAGRAM ON YELLOW LINED PAPER WAS MARKED DEFENDANTS' EXHIBIT E, IDENTIFICATION)

Q Now, did you have any involvement in the workmen's compensation claim?

A Workmen's compensation is done in two phases at SENESCO. You've got the communications with the workmen's comp. through Beacon Insurance, for example, and then you have the investigation side. Yes. When it came to the investigation side, I worked with Mike Ehrmanntraut all the way to the end. When it came to the actual lost time injuries or that type of stuff, the OSHA log and Brown handled it and then communicated -- that's the nurse, Nurse Ann Brown. And she then communicated with the workmen's comp. rep from Beacon on that side. So we worked in tandem together doing was different phases.

Q Do you know if there was a longshore claim filed?

A That was something she would cover.

Q Okay. You don't know if --

A No, I do not.

Q Okay.

A Then everyone seems like they can double-dip, so everyone's jumping into longshore and workmen's comp.

Q But you don't know on this case whether or not there was --

A That's their worker. They would definitely want to be aware that their worker was hurt.
Q Okay. Do you know if CCI would pay for any of the required medical treatment for a CCI worker if they were hurt?
A I believe their workmen's comp. did.
Q Okay. So anytime a CCI employee was injured on the job for whatever reason, whatever type of injury, you'd contact CCI and let them know?
A That's true.
Q All right.
A Later on they actually wanted full copies of my accident reports. In the beginning all they wanted were phone calls.
Q Okay. Now, when these CCI employees would come on the job, you know, when they initially came to SENESCO, would you be provided any information as to what type of training they had in their background, for example?
A Sometimes, but I believe in the philosophy that if someone tells me he's trained on a fork truck, but I don't believe it until I train him myself.
Q Okay.
A So he may tell me, "I've operated a fork truck and been licensed for ten years," but until I see it

I don't give him a license.
Q Okay. Would CCI itself, the company itself, send you sort of a package or resume of these workers?
A No. Not to me.
Q Not to you?
A I don't know what they gave to other people in the company.
Q So from your perspective, you would talk to the employee; and if they had been trained on a forklift, you would train them, anyway, just to be sure?
A Correct.
Q All right.
A Or manlift or fall protection, welding machinery, gouging tools, come-a-longs.
Q Now, you mentioned this company Safety Plus, I think the name came up; and you said that was a company that did work for CCI?
A I believe it's their workmen's comp. carrier.
Q Okay.
A Or they're the safety investigator for their workmen's comp. carrier.
Q Okay. So that would be a company that would investigate workplace injuries for CCI employees?
A Yes. They showed up, I believe, on all the major accidents.

A Yes. Well, that he's going to be sending me up some oysters as soon as the Gulf gets a little better.
Q Are you friendly with him?
A Oh, yeah. We swap lobsters or oysters all the time. He's a, Jerome's a solid man.
MR. CANNON: Okay. All right. That's all I have. Thanks.
MR. COLLINS: I just have, hopefully, just a couple.
THE DEPONENT: You guys playing tag here?
MR. COLLINS: No. He opens up something, and I got to close the door.
MR. CANNON: It's not unusual.

**FURTHER EXAMINATION BY MR. COLLINS**

Q The coordinator for CCI, --
A Yes.
Q -- whoever it is, --
A You got it.
Q -- do they have any control over the worker on the job?
A No.
Q No. They're just facilitating movement of people, maybe investigating accidents, one with safety laws?
A Anytime --
MR. CANNON: I just want to interpose an

objection to the last question. But you can, you were going to answer. I'm sorry. I didn't mean to interrupt you.

A That's all right. I do a lot of that myself. They can do one thing. They can pull the worker out to go take him someplace. So in the aspect of can they interrupt production? Yes. They can take the worker out and say, "We're sending him for testing." Okay? Or, "We're bringing this, or we're doing that." Okay? But they can't say, "No, you're not going to weld this today."

Q Right.

A "You're not going to tell --" or they'll say, "No, you don't have to wear goggles with that operation, no." But they can say, "No. You're leaving at 12:00 today. You got to, we're taking you someplace else." CCI has a rule any injury gets a drug testing right afterwards. That's illegal in the State of Rhode Island, but not in the South. So if their worker were to get hurt at 10:30 in the afternoon, that rep may show up at noon and say, "You're coming with me. We're going down to the treatment center, and you're going through your alcohol/drug testing." So we don't have that. So did I answer you?

Q Yes. Yes. Otherwise, they don't control the work?

A No.

MR. CANNON: Objection.

MR. COLLINS: I kind of worded that badly 'cause your answer was in the negative.

Q Does CCI control any of the on-the-job work? Does the -- I'm sorry. Does the coordinator control any of the on-the-job work of a CCI employee?

MR. CANNON: Objection. You can answer.

A I was waiting for you to say that. No.

MR. COLLINS: That's all I have.

A (Continued) They are limited, however. They won't put a shipfitter in a welding job or welder in a shipfitting job. Again, there are some administrative controls, but not, they don't report to them; they don't give direction; they don't tell them what tasks, what hazards, what safety precautions, what tools to use.

MR. COLLINS: Okay.

**FURTHER EXAMINATION BY MR. CANNON**

Q You mentioned the drug testing --

A Yes.

Q -- of CCI employees. When a SENES--- if a SENESCO employee is injured on the job, do they have, are they required to have drug testing?

A It's illegal in the State of Rhode Island, so, no.

Q So, no. Only CCI employees, correct?
A 'Cause they're not based out of Rhode Island.
Q And if the coordinator came in and said, "I want to pull a CCI employee off the job," that they would have that authority, correct?
A I've never seen them say "no."
Q Never seen SENESCO say "no"?
A Correct.
MR. CANNON: I think that's all I have.
MR. COLLINS: Got one more question. I found something. Just minor one.

**FURTHER EXAMINATION BY MR. COLLINS**

Q In Exhibit 1, your accident report, there's a reference to Mr. Guillory weighing two hundred and seventy-three pounds. Do you know where that came from?
A I believe we got that from his pre-employment physical. Because I was trying to make sure we were under the five hundred pound limit, --
Q Right.
A -- as dictated by JLG, the manufacturer of the manlift.
MR. COLLINS: That's all I have.
MR. CANNON: Thank you, sir.
(Deposition concluded at 11:55 a.m.)




10/24/06