there so, no, I didn't like this agreement because I didn't like what he put on the end there. See the "WD"? He wrote that in there. That's why I didn't sign it.
Q. You didn't sign it because of this language "SENESCO will maintain current leased employees from other agencies. This agreement is in effect for future employees only."
A. There were a hundred other employees over there and I didn't like that.
Q. A hundred other leased employees?
A. Sure.
Q. So you wanted the exclusive right to provide leased employees?
A. Correct.
Q. Now, this agreement is dated February 6, 2004; correct?
A. Correct.
Q. Do you know when -- let me strike that. The signature on the last page under SENESCO is by I guess it's Mr. Durfee, CEO. Do you see that on the top half of the page? Is that -- when you received your copy back, did it have this handwritten notation on the bottom?

A. I believe it did. I think this is -- I think this is why I didn't -- to the best of my knowledge, this is why I didn't sign this because of this -- he didn't tell me anything about this until it was all over and we were about to close this thing up. Then all of a sudden he throws in this last thing about this other contractor that was in there and it really peeved me off. I do remember that.
Q. You were agreeable to the terms of this contract except for the handwritten section on the last page; is that fair to state?
A. That's fair to state.
Q. In other words, if it did not have that language on the third page, you would have signed the agreement; correct?
A. Probably, yeah.
Q. Is this something that was negotiated by your attorney?
A. Yes.
Q. So by this time you did have an attorney; correct?
A. Yes.
Q. Who was your attorney?
A. Gil Dukes.

Q. Is Mr. Dukes still your attorney?
A. He's a tax attorney. I just used him for this -- specifically for this contract. He's my wife's boss.
Q. Is he down in Mobile?
A. Yes.
Q. Page two of this agreement under Article 7, control of employees, CC,I. Do you see that?
A. Yes.
Q. Was that paragraph agreeable to you?
A. Yes.
Q. And under the terms of this paragraph under (a), you would or your company CC,I would assume responsibility for the payment of wages of the employees without regard to payments by the client company to CC,I. Now, client company here was SENESCO; correct?
A. Correct.
Q. You'd be responsible for paying the employees even if SENESCO hadn't paid you; correct?
A. Correct.
Q. And CC,I assumes responsibility for payment of payroll taxes and collection of taxes from payroll on employees; correct?
A. Correct.

Q. That was agreeable to you; correct?
A. Correct.
Q. You would just withhold the taxes; correct?
A. Correct.
Q. Under (c), CC,I retains the right to hire, fire, discipline and reassign employees.
A. Outside of the yard, yes. This retains the right to hire and fire. It doesn't have anything to do with inside the shipyard. This is if they destroy the hotel, if they beat up my coordinator, if they get put in jail. Yes, I do agree with that. I agree with that outside the shipyard where the only place I have control of them, yes.
Q. The language "outside the shipyard" doesn't appear in that paragraph.
A. No, but the customer knows I have no control inside the shipyard.
Q. If an employee say destroyed the motel room, hotel room, went into a drunken rage, for example, CC,I would have the power to fire them?
A. Yes.
Q. If they got into difficulty with the police, for example, CC,I could fire them; correct?

A. Correct. I could take them off my payroll, yes. I could fire them off my payroll. The shipyard might elect to take them in there on their own. There's nothing I can do about it. Yes, I can take them off my payroll at any time.
Q. They would be off your payroll?
A. Yes, sir.
Q. It also says you could reassign an employee; correct?
A. To a difference shipyard, different state; correct.
Q. If an employee was a temporary employee of SENESCO, could you reassign that employee to a different shipyard?
A. Sure. I can pull him out of SENESCO and bring him to another site, sure.
Q. Assuming the employee agreed, of course?
A. Of course.
Q. Let's say you wanted to -- in the case of Mr. Gukutu, if he was working at SENESCO, for example, and you needed to reassign someone with his qualifications to a shipyard let's say in Maine or down south in Alabama, you could do that?

A. I could but I don't. I don't ever pull people from one job. I tell every customer I will never pull employees away from your job to fill another order to make the same money. It doesn't make sense for me to pull him off one bill rate to go get the same bill rate a thousand miles away. I don't do it but, yes, I could do it if I wanted to but I do not do it.

Q. You don't do it but if you wanted to and situations changed, CC,I would have the power to do that, could do that?

A. Could possibly lose the contract while doing it but, yes, we could do it. We'd probably lose the job if we did it but, yes, we could do it.

Q. It may not make business sense but CC,I could do that; correct?

A. Correct.

Q. Could CC,I also discipline an employee or suspend an employee from working at SENESCO?

A. If requested from working at SENESCO? I can suspend him from working in this state for me. I can tell him to leave. If requested by the yard maybe, if the yard says we want

you to suspend this guy, because they're always wanting to put blame on me so maybe they want to make me look like the bad guy. That has come up before. The shipyard says we don't want to fire him but we want him suspended. Only if I'm requested by the shipyard, never on my own.
Q. That has happened before?
A. Yes, that has happened on occasion.
Q. So SENESCO would contact CC,I and ask CC,I to suspend one of the leased employees?
A. Right.
Q. And would CC,I do that on occasion, suspend a leased employee?
A. We'll do whatever the customer wants us to do.
Q. But as far as reassigning an employee, although it might not make any business sense, you could reassign an employee even without SENESCO's permission?
A. Sure.
Q. Now, has CC,I ever disciplined an employee who worked at SENESCO in the past?
A. The only discipline I use is no rehire. I never hire them again in their lifetime.

That's the only discipline I use.
Q. Are these workers that you place at SENESCO, are they there for a particular period or an open-ended period?
A. It's a temporary position. It's a spike.
Q. Do you tell the worker that it looks like you'll be at SENESCO for one month, three months, six months, something of that nature?
A. Sometimes.
Q. And when that period ends, on occasion do you remove the worker?
A. Sometimes, yes.
Q. Would that be a decision made by CC,I?
A. No. It's made by SENESCO.
Q. Now, if CC,I wanted to terminate an employee for some conduct outside the yard, they could do so without SENESCO's permission; correct?
A. Correct.
Q. Discipline an employee for some conduct outside the yard, they could do that, too, correct, without SENESCO's permission?
A. Correct.
Q. Just so I'm clear, on occasion SENESCO would sometimes contact CC,I and say we want this employee disciplined or suspended. We want

A. I don't think it says anything about it. So, no, I don't think -- I think it says I was responsible for payroll taxes on here, doesn't it?
Q. Even though there wasn't any language, specific language, in the agreement, the first agreement you signed back in 2003, CC,I could still discipline workers for any offenses that they did outside the yard; correct?
A. Okay.
Q. Is that correct?
A. Sure. I could discipline -- well, I mean, I could fire employees. I could take them off my payroll at any time. That's the only discipline I have is firing somebody.
Q. You could always fire an employee?
A. Yes.
Q. Even under the initial agreement; correct?
A. Correct.
Q. Suspend them or discipline them if you felt that was proper; correct?
A. Well, like I say, that never came up until now. At this time, during this period, up until now I've never -- the only thing I've

ever done is fire an employee. I've never disciplined an employee other than fire them.

Q. How many employees have you fired over the years who work at SENESCO?

A. Hundreds.

Q. You fired hundreds?

A. Yes.

Q. This is for a variety of offenses; right?

A. Let me take that back. I have fired a lot of employees at SENESCO from SENESCO's telling me they missed too much time. I want them out of here. Now, I personally haven't fired anybody unless SENESCO directed me to. No, I haven't fired anybody on my own from SENESCO. I've fired hundreds of people for missing time because SENESCO told me if they miss another day, I want to get them out of here. When they miss another day, they'd say get them out of here. That is when I would go pick them up and send them home. I don't recall firing anybody on my own without SENESCO requesting it. I don't recall ever firing anybody on my own.

Q. Did you ever have any situations where someone destroyed a hotel room or got

arrested or -- anything like that?

A. Yeah, I've had a bunch of those but I don't recall personally firing one for -- other than the direction of the shipyard. I've charged them for the damage in the room and whatever it cost me to get them out of jail, I've done that numerous times.

Q. Suspended them from work at all?

A. No. No, because I don't make money. I want them to work every hour they can. That is when I make money. If they don't work, I don't make money.

MR. CANNON: Let's go on to the next agreement. This is December one. Have that marked as Exhibit Six, please.

(Agreement of 12/1/05 was received in evidence as Plaintiff's Exhibit No. 6 for identification.)

Q. Exhibit Six, Mr. Christian, have you looked at this document before you came here for your deposition today?

A. This is the same as -- I don't think so. This is -- this was not before today, no, sir.

Q. Directing your attention to the fourth page of the document, is that your signature?