EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

ALLISON MARIE DUNBAR GUILLORY
Administratrix of the Estate of
Patrick Guillory, and as Parent
and Next Friend of WINTER
LAPATRIA GUILLORY and
ARIEL JU'NEA KEON GUILLORY

vs. C.A. NO.: 06-171-S

REASON GUKUTU and
CHRISTIAN PERSONNEL, INC.
d/b/a CHRISTIAN CONSTRUCTION INC.

DEPOSITION OF **MICHAEL PATRICK SCANNELL**, taken on behalf of the Plaintiff, Tuesday, October 24, 2006 at 10:12 a.m. pursuant to the Federal Rules of Civil Procedure at the law firm of Decof & Decof, P.C., One Smith Hill, Providence, Rhode Island before Linda F. Oakley, RPR, Inc., Notary Public.

APPEARANCES:

DECOF & DECOF, P.C.
BY: VINCENT T. CANNON, ESQ.
Counsel for the Plaintiff

CLINTON & MUZYKA, P.C.
BY: ROBERT E. COLLINS, ESQ.
Counsel for the Defendants

REPORTING ASSOCIATES
Westminster Square Building
10 Dorrance Street, Suite 617
Providence, RI 02903

# I N D E X


| DEPONENT | PAGE NO. |
|---|---|
| Michael Patrick Scannell | |
| Examination by Mr. Cannon | 4 |
| Examination by Mr. Collins | 33 |
| Further Examination by Mr. Cannon | 71 |
| Further Examination by Mr. Collins | 83 |
| Further Examination by Mr. Cannon | 85 |
| Further Examination by Mr. Collins | 86 |

| EXHIBITS | DESCRIPTION | PAGE NO. |
|---|---|---|
| Plaintiff's exibits | | |
| 1, I.D. | Photostatic copy of SENESCO Marine four-page document titled Accident Report for Fatality on June 15, 2005 | 17 |
| 2, I.D. | Photostatic copy of one-page SENESCO Marine memorandum to Mary Hoye, OSHA from Michael Scannell dated September 26, 2005 | 30 |
| 3, I.D. | Photostatic copy of SENESCO Marine memorandum to Mary Hoye, OSHA from Michael Scannell dated September 26, 2005 | 31 |
| Defendants' exhibits | | |
| A, I.D. | Photostatic copy of License Maintenance record of Reason Gukutu | 41 |
| B, I.D. | Photostatic copy of four certifications | 52 |

A Yes, he went through the initial program, correct.
Q Okay. And did he successfully complete the program?
A Yes, he did.
Q Now, and as part of that program would he receive instruction in the operation of a manlift in this instance.
A Oh, most definitely, yes.
Q And would he be told as part of his instruction that when he was operating a manlift at SENESCO, he should be in exclusive control of the operation of the manlift?
A Yes, that's right.
MR. COLLINS: Objection.
THE DEPONENT: Yes, sir.
Q In other words, --
MR. COLLINS: You can answer. Sorry. I can't tell you not to answer. I'm just objecting.
MR. CANNON: He's objecting.
A Oh, you're objecting. I'm sorry.
Q He's objecting for the record. You can still answer.
A All right.
Q Now, so that, when an operator such as Mr. Gukutu was operating a manlift, such as the manlift involved in this case, that operator should be the only one controlling the manlift, correct?

MR. COLLINS: Objection.
A Yes.
Q Okay. And that's what he would have been instructed?
A You wouldn't drive your car and let someone else control the pedals. Same thing in any operation of any moving object. One man's in control at all times.
Q Kind of like driving an automobile?
A That's what I said. Perfect example.
Q Good analogy.
A Even though when I was little, my dad put me on his lap, and I steered the wheel. And we've probably all been through that. Sorry.
Q Now, Mr. Scannell, did you know -- let me strike that. Mr. Guillory, --
A Yes, Patrick.
Q -- the person who died in this case, now, how long was he at SENESCO, if you know, before this accident?
A Only a few months.
Q Okay. Had he received any of the training in the operation of the manlift?
A Half.
Q Which had he -- which half had he received?
A The classroom.
Q Okay. Was he certified or approved to operate a

manlift?
A No, he was not.
Q Now, --
A Basically, good example of the automobile, he went through driver's training. He didn't get his license yet.
Q Okay.
A That's something most of us can understand. You go through Part A, and you go to Part B.
Q Now, are you familiar with the term green, green hat?
A Sure. I generated it.
Q And what does that mean?
A A green hat program is set up to allow workers in the shipyard to know that a fellow worker is new to a shipyard.
Q Okay. That would be accomplished by that worker wearing a green hat?
A A bright green hat.
Q Okay.
A Wet behind the ears, young guy, whatever term you wish to use, limited experience.
Q This would be a green hard hat?
A Oh, yes, it would.
Q Now, was Mr. Guillory a, quote, green hat employee at

A That would be production.

Q Who would have that knowledge, as to what the direction and control was of the CCI employees?

A Well, I, Mike Foster as the vice president of production. Bruce Cresser as production superintendent. I believe you've already talked to Earl Barden. He was one of the supervisors. George Connor, welding superintendent. And I believe Bart Madison was the barge superintendent at the time of this incident. He's now just a supervisor.

Q Okay. And was it your understanding as to whether or not CCI employees were treated any differently than SENESCO employees?

MR. CANNON: Objection. You can answer.

A Treated any differently. They're expected to know a lot more about shipyards 'cause we're hiring them and paying a top premium for experienced shipyard workers. They were supposed to be workers from the south, who had built barges in New Orleans. So with that statement in mind, they were expected to be the cream of the crop. So would they get special privileges? Not special privileges, but they would be expected to do the more complicated tasks. Does that answer your question?

Q As best you can, yes. Now, you're familiar with