contractor.
Q Okay. Back in June of 2005, at the time of this accident, would half of the employees be CCI employees?
A It may have been a third.
Q About a third?
A They took over quite a bit of the Boeufway tasks.
Q Okay. Now, you also testified, I think, that you would have fairly regular contacts with, communications with CCI?
A Yes.
Q And you would speak to an individual, I believe you identified as Jerome Christian?
A And Jacques.
Q And Jacques?
A And I don't know Jacques' last name.
Q And then a Charlie, I think, was that?
A Charlie only in the beginning. Charlie retired.
Q What was the nature of the communications? I mean, why would you contact them? For what reason?
A First you would contact them if you were doing training on one of their workers; for example, new employee orientation, or if that worker didn't show up for orientation, or if he's a welder and doesn't have his proper clearance from the doctor to put on a

respirator.
Q Why would you contact them if an employee didn't show up for orientation?
A 'Cause it's taking time out of my job, and I'm waiting for him.
Q Would CCI then contact the employee?
A They'd find out where he is. Sometimes he went to work right away and forgot to go to orientation. Sometimes he's still in the van and just sitting out front.
Q Okay.
A When they use a van to move people from the hotel, they have to wait for everyone to be ready. So I may be starting orientation and half the crew is in the van or three quarters, and they're waiting for one or two more guys to get out of the shower, or whatever there's the reason that's holding them up. So I would call them to say, "Hey, where are your guys?"
Q Now, would CCI provide a hotel or living arrangements for these people when they came up to work at the shipyard?
A I know they paid for it. I don't know was it our HR that arranged it or theirs. I don't know. It may be part of their coordinator's job to find hotels.
Q Now, did CCI have a coordinator in Rhode Island

working?
A Most of the time.
Q Okay. And that would have been a CCI person, correct?
A Correct. Like that guy Charlie was telling you about.
Q Okay. And would this person --
A And --
Q -- coordinate your training of these CCI employees?
A Yes. If they had a coordinator out front, I would call them first before borrowing Jerome.
Q Okay. And this coordinator would be at SENESCO or in the area of the shipyard?
A Yes.
Q And the coordinator, I believe you also indicated, there would be transportation from the hotel or where these folks were staying to the shipyard?
A Or the hot-- or the shipyard to the treatment center.
Q Okay.
A Or whatever they needed.
Q And would that be provided through CCI or through a CCI person?
A Yes.
Q And this, would the coordinator you mentioned be the person that would coordinate that activity,

transportation?
A Normally they drove the van.
Q Well, they actually drove the van. Okay. So they would drive the workers to the shipyard or to --
A Yes.
Q -- different treatment as needed?
A Everyone, except for Kerney Duckworth.
(Discussion off the record)
Q Okay. So you mentioned you would contact CCI, Jacques, or Jerome or Charlie when someone didn't show up for training or to coordinate their training; is that accurate?
A And one more time. Yes.
Q Okay.
A That is accurate and one more time.
Q Okay. And what other reasons --
A There you go.
Q -- would you contact them?
A If there was an injury.
Q All right.
A If I had to remove debris from their eyes, if I had to perform minor first aid, or if we had to take them to the treatment center.
Q And why would you do that? Why would you have to contact CCI?

A That's their worker. They would definitely want to be aware that their worker was hurt.
Q Okay. Do you know if CCI would pay for any of the required medical treatment for a CCI worker if they were hurt?
A I believe their workmen's comp. did.
Q Okay. So anytime a CCI employee was injured on the job for whatever reason, whatever type of injury, you'd contact CCI and let them know?
A That's true.
Q All right.
A Later on they actually wanted full copies of my accident reports. In the beginning all they wanted were phone calls.
Q Okay. Now, when these CCI employees would come on the job, you know, when they initially came to SENESCO, would you be provided any information as to what type of training they had in their background, for example?
A Sometimes, but I believe in the philosophy that if someone tells me he's trained on a fork truck, but I don't believe it until I train him myself.
Q Okay.
A So he may tell me, "I've operated a fork truck and been licensed for ten years," but until I see it

I don't give him a license.
Q Okay. Would CCI itself, the company itself, send you sort of a package or resume of these workers?
A No. Not to me.
Q Not to you?
A I don't know what they gave to other people in the company.
Q So from your perspective, you would talk to the employee; and if they had been trained on a forklift, you would train them, anyway, just to be sure?
A Correct.
Q All right.
A Or manlift or fall protection, welding machinery, gouging tools, come-a-longs.
Q Now, you mentioned this company Safety Plus, I think the name came up; and you said that was a company that did work for CCI?
A I believe it's their workmen's comp. carrier.
Q Okay.
A Or they're the safety investigator for their workmen's comp. carrier.
Q Okay. So that would be a company that would investigate workplace injuries for CCI employees?
A Yes. They showed up, I believe, on all the major accidents.

Q Okay. And you understood that they were paid by CCI or worked for CCI?
A Either they were paid by their workmen's comp. carrier, or they were paid -- I don't know.
Q You don't know?
A You're asking me -- now I'm guessing here, and I shouldn't do that.
Q Let me just ask you a couple of more questions. At the time of this accident in June of 2005, do you recall the name of the CCI coordinator in Rhode Island at that time?
A I don't know if it was Kerney Duckworth or was it Jacques. I'm sorry. I don't know. But it's definitely one of those two.
Q Jacques or Kerney Duckworth. Now, you said you left the company about six weeks ago. Were, who was the coordinator at that point, if you remember?
A Rhonda, what's her last name? Grace? Gross?
Q Gross?
A Graves.
Q Graves. Yes.
A Rhonda.
Q To the best of your knowledge, is she still at, in Rhode Island?
A Yes.

Q Okay.
A Best of my knowledge.
Q Do you know where her, where she can be reached, where her office is located?
A No, I do not.
Q Okay. Did Jacques, Jacques leave Rhode Island sometime after this accident, or does he still work in Rhode Island?
A Oh, no. Jacques would fly up here from his office and home in New Orleans. Jacques like an upper management.
Q Oh, okay. I'm sorry. I thought --
A He was filling in for the coordinator's position when they couldn't find somebody.
Q Oh, okay. So he would fill in until they found somebody?
A Correct.
Q And how long was he in Rhode Island filling in in that position, approximately?
A It varied. He could be two or three months or, you know. I'm sorry.
Q Okay. But he did that. Would he, did he do that several times, fill in as coordinator?
A A few times.
Q Few times. All right. And the other person you

mentioned, who was the coordinator in June of 2005, in addition to Jacques, what's the other name you mentioned?
A It could have been Kerney Duckworth.
Q Kerney Duckworth, is he still at the company?
A No, he is not.
Q Has he left Rhode Island, as far as you know?
A I don't think he even works for CCI anymore.
Q Okay.
A I have no idea where he went.
THE REPORTER: Do you know he spells his first name?
THE DEPONENT: Kerney, K e r n e -- no, I don't. I'm a lousy speller.
MR. CANNON: Okay.
THE DEPONENT: K e r n e y, maybe.
Q Was he a full-time coordinator for CCI in Rhode Island?
A He originally was a shipfitter and part of my safety committee. And when an opening occurred, he decided to take a position of more management than working.
Q Oh, okay. So he worked as a shipfitter at SENESCO?
A Correct.
Q But he was a CCI employee?
A Yes, he was.

Q And then he was one of the two CCI employees on your safety committee, you mentioned earlier?
A At one period of time, yes, he was.
Q And then he left and became the CCI coordinator in Rhode Island?
A M-hm. (Affirmative)
Q Correct?
A Yes.
Q He would have been the guy who drove the van, and so forth, that you mentioned earlier?
A Yeah. Drive the van, go to the treatment center, go get people's respirator clearances, make sure their doctor appointments are okay, issue them their paychecks.
Q When did, do you know when he left --
A No.
Q -- the area?
A No. I'm sorry. I do not.
Q Okay. Do you know approximately how long he was the coordinator? If you recall.
A It would be a shot in the dark, but I'll give you four or five months.
Q Four or five months. Okay. Was he originally from New Orleans or --
A Correct.