UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| ALLISON MARIE DUNBAR GUILLORY, Administratrix of the Estate of Patrick Guillory, and as Parent and Next Friend of WINTER LAPATRIA GUILLORY and ARIEL JU'NEA KEON GUILLORY, | ) | |
| Plaintiff, | ) | |
| v. | ) | C.A. No. 06-171 S |
| REASON GUKUTU and CHRISTIAN PERSONNEL, INC. d/b/a CHRISTIAN CONSTRUCTION, INC., | ) | |
| Defendants. | ) | |

OPINION AND ORDER

William E. Smith, United States District Judge.

Defendants Reason Gukutu and Christian Personnel, Inc. d/b/a Christian Construction, Inc. ("CCI"), (collectively "Defendants") move jointly for summary judgment on all claims brought against them by Plaintiff Allison Marie Dunbar Guillory ("Plaintiff"), acting as Administratrix of the estate of the decedent, Patrick Guillory ("Guillory"), and as Parent and Next Friend of Guillory's children. For the reasons set forth below, and after careful review of the legal and factual bases for Defendants' motion, the Court will grant summary judgment on all counts.

Background

The material facts at issue here are not disputed. CCI is an Alabama staffing company that provides skilled workers to businesses in the maritime industry. In September 2003, CCI and

Senesco, a shipbuilder, entered into a contract pursuant to which CCI would provide Senesco with skilled workers. That same month, Reason Gukutu became employed by CCI and was sent to Rhode Island to work as a shipbuilder/shipfitter at the Senesco facility at Quonset Point, North Kingstown. In the spring of 2005, Gukutu was working with Patrick Guillory, a Senesco employee, in the construction of a barge at the Senesco facility. The two had worked together for approximately one month when, on June 15, 2005, Guillory tragically was killed when the man-lift that Gukutu had been operating pinned Guillory between the man-lift basket and the controls.

After the fatal accident, Senesco filed for workers' compensation benefits on behalf of the decedent under both the Rhode Island Workers' Compensation Act, and the Longshore and Harbor Workers' Compensation Act ("LHWCA" or the "Act"). Plaintiff was awarded workers' compensation benefits pursuant to Rhode Island's statutory scheme.[1] Plaintiff then filed the instant

---

[1] State workers' compensation laws and the LHWCA "confer concurrent jurisdiction and afford complementary remedies. No election-of-remedies problem arises when the remedies are complementary." Young v. Gen. Dynamics, 494 A.2d 100, 102 (R.I. 1985); see also Sun Ship, Inc. v. Pennsylvania, 447 U.S. 715, 723 (1980). Thus, workers who claim benefits under state law may also recover under the LHWCA provided that there is no double recovery. However, while the Act is not an exclusive remedy, and instead co-exists with state compensatory schemes, where a state's workers' compensation laws provide less generous benefits than the LHWCA, the federal scheme is deemed preemptive. See Sun Ship, 447 U.S. at 723-24 (in enacting the LHWCA, Congress intended to address "the paucity of relief under *state* compensation laws," and aimed to

action asserting claims of negligence and wrongful death against both Gukutu and CCI, and negligent hiring and training against CCI. In this Motion for Summary Judgment, Defendants invoke the "borrowed servant" doctrine, asserting that while Gukutu was the nominal employee of CCI, he was a borrowed servant of Senesco, and thus entitled to the protection from tort liability afforded to co-workers under the LHWCA. Defendants further assert that CCI is entitled to share the immunity of its nominal employee on the counts against it sounding in negligence via *respondeat superior* and as to any negligent hiring and training claims.

Standard of Review

Under Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party," id. at 960 (citation omitted),

---

"upgrade the benefits").

and an issue of fact is "material" "only when it possesses the capacity, if determined as the nonmovant wishes, to alter the outcome of the lawsuit under the applicable legal tenets." Roche v. John Hancock Mut. Life Ins. Co., 81 F.3d 249, 253 (1st Cir. 1996). Summary judgment involves shifting burdens between the moving and the nonmoving parties. Initially, the burden requires the moving party to show "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). Having established this, the burden then falls upon the nonmoving party, who must oppose the motion by presenting facts that demonstrate a genuine trialworthy issue remains. Cadle, 116 F.3d at 960. This burden can be satisfied by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993).

Analysis

The LHWCA "is a no-fault federal compensation scheme designed to give protection to injured maritime workers while at the same time affording employers some degree of predictability with regard to those workers' recoveries." White v. Bethlehem Steel Corp., 222 F.3d 146, 148 (4th Cir. 2000). Pursuant to the LHWCA, "every employer subject to [it] shall be liable to its employees for workers compensation. 33 U.S.C. § 904. Such liability is

exclusive and in place of all other liability, and extends to fellow servants. 33 U.S.C. §§ 905(a), 933(i)." Canty v. A. Bottacchi, S.A. de Navegacion, 849 F. Supp. 1552, 1556 (S.D. Fla. 1994). Though an exclusive remedy for employees in relation to their employers and co-workers, the LHWCA does allow for actions against third parties when a person other than the employer is liable for damages. Id.; see also 33 U.S.C. § 933(i).

In this case, Defendants have asserted, and Plaintiff does not dispute, that Guillory and Gukutu were employees engaged in marine employment as shipbuilders and that the injuries complained of fall within the parameters of the Act's coverage. See 33 U.S.C. §§ 902(3), 903(a). Because the situs and status elements are established and undisputed, there is no dispute that federal law applies to the analysis of the LHWCA. Anaya v. Traylor Bros., Inc., 478 F.3d 251, 254 (5th Cir. 2007) ("To receive benefits under the LHWCA, a worker must satisfy both a situs and status test."); see also Canty, 849 F.Supp. at 1556 (because the issue of borrowed servant status "is essentially one of determining the extent of coverage under the LHWCA, federal law applies").

I. Borrowed Servant Status

Gukutu's employment status under the LHWCA determines the potential liability that he and CCI face in this action. Therefore, the primary issue before this Court is whether Gukutu was a borrowed servant of Senesco at the time of the accident,

because if he was, both he and CCI are cloaked from liability by the immunity enjoyed by Senesco.

Under these circumstances, the question of borrowed servant status generally is a matter of law. See Canty, 849 F. Supp. at 1556; Gaudet v. Exxon Corp., 562 F.2d 351, 357-58 (5th Cir. 1977); Raymond v. I/S Caribia, 626 F.2d 203, 205 (1st Cir. 1980). "A dispute over whether one is a borrowed servant . . . could still exist although all the facts were stipulated, for it concerns not only the facts themselves but the implications to be drawn from the facts." Gaudet, 562 F.2d at 358. "[I]f sufficient basic factual ingredients are undisputed, the court may grant summary judgment." Capps v. N.L. Baroid-NL Indus., Inc., 784 F.2d 615, 617 (5th Cir. 1986).

The First Circuit has not adopted a specific test for determination of borrowed servant status for purposes of the LHWCA. Without setting forth any particular guidelines, however, the Court in Raymond recognized that "[t]he prime requisite for invoking the borrowed servant doctrine is some sort of control by the borrower over the loaned employee(s)." 626 F.2d at 205. There, the Court inquired as to whether a ship's crew members were borrowed servants of the stevedore after they were sent into the hold of the ship to assist the stevedore's longshoremen-employees, who were unloading the ship's cargo. Utilizing the control-based standard above, the Court ruled as a matter of law that crew members were not borrowed

servants of the stevedore. After evaluating the "indicia that is necessary for a finding of borrowed servants," - namely the level of control and direction asserted by the stevedore over the work performed by the crew, whether the crew was paid by the stevedore, either directly or indirectly, and the employer relationship between the stevedore and the crew members - the Court determined the situation to be a case of cooperation, rather than one of subordination. Id. at 205.

The general formula used in Raymond echos the Fourth Circuit's test, which requires inquiry into whose work "is being performed . . . by ascertaining who has the power to control and direct the servants in the performance of their work." White, 222 F.3d at 149 (declining to adopt a multi-faceted test, but ruling in favor of borrowed servant status). "The authority of the borrowing employer does not have to extend to every incident of an employer-employee relationship; rather, it need only encompass the servant's performance of the particular work in which he is engaged at the time of the accident." Id. There, the key question is "whether the borrowing employer has authoritative direction and control over a worker." Id. Likewise, in Peter v. Hess Oil Virgin Islands Corp., 903 F.2d 935, 941 (3d Cir. 1990), the Third Circuit determined that when "an entity other than the one that putatively employs that claimant is really the claimant's employer, that borrowing employer [shall be] found to be the claimant's employer

under the Act and has been held to be both subject to the burdens and entitled to the benefits that come with such status."

In contrast to these "Right of Control" decisions, the Fifth Circuit has formulated a nine-part test aimed at assessing borrowed servant status:

> (1) Who has control over the employee and the work he is performing, beyond mere suggestion of details or cooperation?
> (2) Whose work is being performed?
> (3) Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?
> (4) Did the employee acquiesce in the new work situation?
> (5) Did the original employer terminate his relationship with the employee?
> (6) Who furnished tools and place for performance?
> (7) Was the new employment over a considerable length of time?
> (8) Who had the right to discharge the employee?
> (9) Who had the obligation to pay the employee?

Gaudet, 562 F.2d at 355 (citing Ruiz v. Shell Oil Co., 413 F.2d 310, 312-13 (5th Cir. 1969)); Peter, 903 F.2d at 942 n.7. Though all nine factors should be considered, "no single factor is determinative," and most courts utilizing this test emphasize the importance of the first, fourth, fifth, six, and seventh factors. Lemaire v. Danos & Curole Marine Contractors, Inc., 265 F.3d 1059, 2001 WL 872840 at *4 n.3 (5th Cir. 2001).

While the First Circuit has not endorsed the Fifth Circuit's nine-part test explicitly, it is a useful rubric by which to assess the question of control in the context of borrowed servant status. Therefore, while Raymond is the beacon which ultimately guides this

Court in its borrowed servant analysis, this Court will analyze the issue by reference to the more nuanced nine-part test.[2]

1. Who had control over Gutuku and the work he was performing, beyond mere suggestion of details or cooperation?

Plaintiff asserts that CCI helped arrange housing and transportation for workers at Senesco, that CCI employed a coordinator responsible for making sure its employees showed up for work at Senesco, and that CCI had authority to hire, fire, discipline, and remove CCI employees from Senesco for their conduct outside of the Senesco shipyard. However, in their Statement of Uncontested Facts, Defendants assert that "the direction and control of the work of Reason Gukutu at Senesco was directed by Senesco. Reason Gukutu took all his work orders on how to perform his assignments from his supervisor at Senesco." Plaintiff does not dispute this, and this fact strongly favors Defendants on the control issue. That CCI had a presence at Senesco, even for the coordination of logistical details, and that Gukutu may have had some form of continued contact with CCI's representative, does not negate the undisputed fact that the actual work performed at

---

[2] In making its assessment of borrowed servant status, this Court notes that Plaintiff did not file a statement of disputed or contested facts. Rather, in response to Defendants' Statement of Uncontested Facts, Plaintiff filed only a Statement of Additional Undisputed facts in which she alleges additional facts in support of her opposition to Defendants' motion for summary judgment. These are not contested by the Defendant, so all of the parties undisputed facts are considered to be true. D.R.I. LR Cv 56.

Senesco was directed, controlled, and overseen by Senesco, and Senesco alone. Accordingly, this Court finds that Senesco had control over Gukutu and the work he was performing.

2. Whose work was being performed?

Defendants' undisputed assertion is that "at the time of the incident, Reason Gukutu was performing the work of Senesco, all of the work assignments were received from a Senesco employee, [and] there was an understanding between Christian and Senesco that Reason Gukutu would be performing the work of Senesco." As Plaintiff neither disputes nor submits contradictory evidence on the issue, this Court concludes that Gukutu was performing Senesco's work.

3. Was there an agreement, understanding, or meeting of the minds between the original and borrowing employer?

Neither party disputes the existence of a contract entered into by Senesco and CCI starting in 2003 through which CCI agreed to provide Senesco with skilled workers. Furthermore, neither party disputes that Gukutu was hired by CCI and sent to work at Senesco pursuant to the terms of the contract, and furthermore that "there was an understanding between Christian and Senesco that Reason Gukutu would be performing the work of Senesco." As there are no facts to support a contrary conclusion, this factor too favors Defendants.

4. Did the employee acquiesce in the new work situation?

The fourth factor focuses on whether an employee was aware of the working conditions of the new employment and chose to continue working under those conditions without complaint. Melancon v. Amoco Prod. Co., 834 F.2d 1238, 1246 (5th Cir. 1988). Defendants assert that "Reason Gukutu acquiesced in the work situation," and further that Gukutu, while living and working in Louisiana, sought employment with CCI for the purpose of being sent out of state into new work situations. Defendants claim that Gutuku knew he might be sent to Rhode Island to perform work here. Once again, these facts are not disputed by Plaintiff, and thus this Court concludes that when Gukutu was sent by CCI to work for Senesco some two years before the incident at issue here, he acquiesced to the new work situation. See Lemaire, 2001 WL 872840 at *6 (even "one month is a sufficient amount of time for [the employee] to appreciate the new work condition") (citing Brown v. Union Oil Co. of Cal., 984 F.2d 674, 678 (5th Cir. 1993)).

5. Did the original employer terminate his relationship with the employee?

It is widely understood that any requirement that entails a complete severance of the relationship between the original employer and its employee would "effectively eliminate the borrowed employee doctrine as there could never be two employers." Capps, 784 F.2d at 617-18. Instead, "[t]he emphasis when considering this

factor should focus on the lending employer's relationship with the employee while the borrowing occurs." Id. at 618. Here, neither party asserts facts directly on point to this inquiry. However, Plaintiff claims that CCI maintained a relationship with its employees at Senesco by virtue of placing a coordinator on-site, arranging preliminary housing and transportation for its employees upon arrival, and by virtue of its authority to re-assign employees and discipline them for off-site conduct. None of these facts speak specifically to Gukutu's relationship with CCI. However, even assuming these facts to be true as they relate to Gukutu, they speak only to a relationship based on logistical matters. They shed no light on the work relationship at issue here, and fail to address issues such as whether CCI exercised control over the work performed by Gukutu, or whether CCI placed any restrictions on Senesco with respect to working conditions.

Although Plaintiff's assertions bolster her position on the fifth factor, the facts relative to this inquiry are insufficient to find against borrowed servant status. Accordingly, this Court finds that because CCI exercised no control over Gukutu, placed no restrictions on the working conditions at the Senesco facility, and had nominal on-site contact with and influence over Gukutu, the fifth factor weighs in favor of borrowed servant status.

6. Who furnished tools and place for performance?

Defendants assert, and Plaintiff does not dispute, that "the tools and place for performance were furnished by Senesco." Although CCI provided to its employees "respirator masks and hand tools," the man-lift being used by Guillory and Gukutu was leased by Senesco, and CCI had no input into its retention, use, or inspection. Furthermore, it is undisputed that Senesco offered and provided to CCI employees safety orientation, as well as man-lift training, overhead crane operation training, fork truck training, and fire watch training. Senesco also provided Gukutu with classroom instruction, training, and an examination resulting in the granting of a man-lift license.

Although Senesco provided the place of performance of the work undertaken at the Rhode Island facility, Plaintiff has accurately pointed out that CCI arranged temporary housing for its Senesco employees. However, as those employees were required to reimburse CCI for housing-related costs, and because the primary focus of this inquiry is on the work-place and not off-site logistical matters, this Court again finds that the sixth factor favors Defendants.

7. Was the new employment over a considerable length of time?

While Guillory and Gukutu had worked together on the barge-building project at Senesco for only one month prior to the accident, the arrangement between Gukutu, CCI, and Senesco existed

for nearly two years prior to that time. As Plaintiff does not dispute Gukutu's factual assertion that he "had been working at Senesco under that arrangement for a considerable length of time," at the time of the accident, this Court need go no further in this inquiry.

8. Who had the right to discharge the employee?

The parties do not dispute that CCI had the right to discharge its employees at Senesco "for conduct outside the shipyard." Furthermore, while Plaintiff asserts that Senesco would work with CCI if it wanted to suspend an employee, no evidence was provided to this Court to indicate that Senesco had any unilateral power to terminate or discharge an employee provided to it by CCI. Although the facts presented on this factor militate against a finding of borrowed servant status, as noted above, in the process of conducting the borrowed servant test, "no one of these factors . . . is decisive." Gaudet, 562 F.2d at 356 (quoting Ruiz, 413 F.2d at 312-13).

9. Who had the obligation to pay the employee?

The parties do not dispute that CCI directly paid the employees it sent to Senesco. Through the payment process, CCI employees would submit their hours to Senesco, which would in turn transmit the information to CCI on a weekly basis. CCI would then issue checks to its employees at Senesco. Senesco paid to CCI an hourly rate for each employee. Although CCI is the entity that cut

and distributed checks, the process demonstrates that Senesco indirectly paid these workers for hours worked at Senesco. As Senesco furnished the funds from which Gukutu and other workers were paid, the test for borrowed servant status on this issue is satisfied. See Melancon, 834 F.2d at 1246; Capps, 784 F.2d at 618; Robinson v. Apache Corp., No. Civ. A. 04-3225, 2006 WL 622917 at *6 (E.D. La. Mar. 8, 2006) (where an employee was paid by his nominal employer based on time tickets turned in to his general employer reflecting number of hours worked on the general employer's behalf, "such discharge and payment arrangements support borrowed employee status").

Of the nine-factors, seven weigh heavily in favor of borrowed servant status. Factor five is essentially neutral, while factor eight favors Plaintiff's position. However, applying these factors as a part of the over-arching Raymond "control" inquiry, the conclusion is inescapable that Gukutu was Senesco's borrowed servant - he was building Senesco's barge at the time of the accident, and only Senesco had the power to control and direct him in the performance of his work. See Standard Oil Co. v. Anderson, 212 U.S. 215, 221-222 (1909).

II. Implications of Gukutu's Borrowed Servant Status

As a borrowed servant, Gukutu remained in the employ of CCI while he was at the same time in the particular employ of Senesco, "with all the legal consequences of the new relation." White, 222

F.3d at 149. Thus, Gukutu's borrowed servant status affects his own liability, as well as that of his employers. There is no question that "[u]nder the 'borrowed employee' doctrine, the tort immunity provided to employers by the LHWCA has been afforded to 'borrowing' employers.'" Robinson, 2006 WL 622917 at *2; Peter, 903 F.2d at 939. Likewise, because borrowed employees and their co-workers are "persons in the same employ for purposes of the LHWCA," payment under the Act "is the injured co-employee's exclusive remedy" when alleging tortious conduct on the part of its borrowed employee co-worker. Jones v. Compression Coat Corp., 776 So.2d 505, 508-09 (La. App. 3d Cir. 2000) (citations omitted) (emphasis added); Perron v. Bell Maint. & Fabricators, Inc., 970 F.2d 1409, 1412 (5th Cir. 1992); see also 33 U.S.C. § 933(i) ("[t]he right to compensation or benefits under this chapter shall be the exclusive remedy to an employee when he is injured . . . by the negligence or wrong of any other person or persons in the same employ"). Because Gukutu and Guillory are persons in the same employ, compensation benefits are Plaintiff's sole available remedy against Gukutu.

Plaintiff brought negligence and wrongful death claims against Gukutu and against CCI, as well as a purported "third party" claim against CCI for negligent hiring and training.[3] Plaintiff is

---

[3] The Court notes that both Plaintiff and Defendants have devoted time in their briefs to Mainella v. Staff Builders Indus. Servs., Inc., 608 A.2d 1141 (R.I. 1992). In a general employment

barred from bringing a *respondeat superior* action against CCI, Gukutu's nominal employer, because she cannot assert against CCI, the employer, her non-existent right against Gukutu, its employee. Jones, 776 So.2d at 509; Perron, 970 F.2d at 1412-13; Lemaire, 2001 WL 872840 at *11-12. Gukutu's shared immunity with CCI is derived from the unique characteristics of the LHWCA: "LHWCA is comprehensive. It has adjusted and re-arranged the rights of maritime and other specifically covered workers. . . . [T]he comprehensive scheme known as [LHWCA] is the *whole* source of rights and remedies." Perron, 970 F.2d at 1413 (citation omitted). Although the LHWCA specifically allows for suit against third parties when "some person other than the employer or a person or persons in his employ is liable in damages," under the comprehensive scheme of the LHWCA, a nominal employer is not an independent third party. See § 933(a). Rather, a "nominal employer and its negligent nominal employee who was a borrowed servant/co-employee to the injured party are solidary obligors." Jones, 776 So.2d at 509. "Consequently, the injured employee may not assert against the nominal employer of his injuring co-employee

---

matter, the Mainella court stated, in *dicta*, that "[w]e observe that the liability of an employer in the negligent supervision or hiring of an unfit employee is an entirely separate and distinct basis from the liability of an employer under the doctrine of *respondeat superior*." Id. at 1145. However, because the instant case involves the LHWCA, and its own particular comprehensive scheme, Mainella is inapplicable.

his right to sue in tort because that right is nonexistent against the injuring co-employee." Id.

Here, Plaintiff argues that CCI is a third party for purposes of its negligent hiring and training claim, and as a result, the immunity afforded nominal employers under the LHWCA does not apply. Plaintiff's negligent hiring/training claim asserts that CCI breached its duty "to exercise reasonable care in selecting and training employees" by "selecting and hiring Defendant Reason Gukutu, who was unfit and incompetent for the work assigned to him at Senesco Marine." Plaintiff asserts that CCI's alleged negligence was a direct and proximate cause of Guillory's injury. Under Rhode Island law,[4] liability for negligent hiring "is based on a failure to exercise reasonable care, by selecting a person who the employer knew or should have known was unfit or incompetent for the work assigned, and thereby, exposing third parties to an unreasonable risk of harm." Fraioli v. Lemcke, 328 F. Supp. 2d 250, 264 (D.R.I. 2004). "Thus, an employer has a duty to protect those who may be reasonably expected to come into contact with his employees from harms inflicted by the employer's workers." Id.

However, pursuant to LHWCA's comprehensive scheme that vests in CCI the tort immunity afforded to Gukutu, this claim does not survive. See Jones, 776 So.2d at 510. The borrowed servant

---

[4] Although the LHWCA is applicable here, there is no unique standard under the Act for establishing a negligent hiring/training claim.

doctrine, as applied under the LHWCA, effectively renders the general employer the master of the borrowed employee for liability purposes, as it is the general employer who controls the work, and working conditions, of its borrowed employee. To assign to a nominal employer any independent duty to protect third parties at the worksite would give that employer a degree of authority, control, and potential culpability over workplace occurrences that the borrowed servant doctrine, as it has been established specifically under the LHWCA, serves to eliminate. As detailed above, the borrowed servant and its nominal employer are considered one and the same for liability purposes. Thus, CCI is immune from even a third party suit brought by Plaintiff stemming from any alleged workplace negligence on the part of Gukutu.

Despite ruling that CCI is immune from Plaintiff's negligent hiring/training claim, it is worth noting that even were the claim legally viable, the facts alleged do not support it. As with the borrowed servant analysis, the facts presented as to the negligent hiring and training claim largely are undisputed. In support of its contention, Plaintiff asserts only two facts: (1) that Gukutu was interviewed over the phone, rather than in person when he applied for work with CCI,[5] and (2) that there is no documentation that any of Gukutu's former employers were contacted for references

[5] Defendants dispute this assertion and instead contend that Gukutu was interviewed in person by CCI before being sent to work at Senesco. The dispute is not material.

prior to his hire. Despite these assertions, Plaintiff fails to set forth any affirmative evidence that Gukutu was unqualified for the position at Senesco. Gukutu worked for nearly two years under the authority and control of Senesco at their Rhode Island facility prior to the accident at issue here, during which time he received safety and equipment training from Senesco, including both classroom and practical instruction, and he took and passed a test for which he received a license to operate a man lift. Because these facts are undisputed, and Plaintiff fails to set forth any evidence to establish that Gukutu was "unfit and incompetent for the work assigned to him at Senesco Marine on June 15, 2005," - and, more specifically any evidence that the alleged unfitness was in any way attributable to CCI - this claim must fail.

For the reasons set forth above, summary judgment is granted as to all of Plaintiff's claims against Defendants Gukutu and CCI. It is so ordered.

WESmith

William E. Smith
United States District Judge
Date: 2/13/08